**Affirmed and Memorandum Opinion filed April 9, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00930-CV

---

## IN THE INTEREST OF C.A.G., III, A CHILD

---

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2016-01043J**

---

## M E M O R A N D U M   O P I N I O N

Appellant M.S.M. ("Mother") appeals the trial court's final decree terminating her parental rights and appointing the Department of Family and Protective Services as sole managing conservator of her child C.A.G., III ("Carter").[1] The trial court terminated Mother's parental rights on predicate grounds of endangerment and failure to comply with a family service plan. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), and (O). The trial court further found that termination of Mother's rights was in the

---

[1] Carter is a pseudonym. Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minor and other individuals involved in this case.

child's best interest. In three issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings on each predicate ground, as well as the best-interest finding.[2] Because we conclude the evidence is legally and factually sufficient to support the trial court's findings, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Proceedings

#### 1. *Referral and investigation*

In February 2016, the Department received a referral alleging sexual abuse and neglectful supervision of five-year-old Carter. At that time, Carter lived at home with Mother and Father. It was reported that Mother and Father use drugs, which impaired their ability to properly supervise a vulnerably aged child. The referral source also reported that Father is a known sex offender with pictures of naked children on his phone.

After receiving the referral, a Department caseworker interviewed Carter at his elementary school. Carter stated that he had seen his mother and father fighting at home. Carter also reported that he had seen his father smoke something that was black; when his father smoked it, his father could not run very fast. The caseworker noted a bruise under Carter's eye, and Carter said it happened when he fell down the stairs.

The caseworker interviewed Mother at the school as well. Mother stated that she was a stay-at-home mom and that Father worked in construction through a "temp agency." Mother reported that she received housing assistance, food stamps, and Medicaid. She denied any (1) criminal or Department history, (2) drug or alcohol use

---

[2] The trial court also terminated the rights of the child's father, C.A.G., Jr. ("Father"), on the predicate grounds of endangerment and failure to comply with a court-ordered service plan; the court also found that termination of Father's rights was in the child's best interest. Father has not appealed the judgment.

2

in the home, (3) guns in the home, or (4) family violence in the home. When asked about the bruise beneath Carter's eye, Mother replied that Carter fell down stairs and she had to grab him to break his fall. Mother confirmed that Father is a registered sex offender but denied that the incident involved a child. The caseworker informed Mother that the caseworker needed to transport Carter to the Children's Assessment Center ("CAC") for a forensic interview.

When the caseworker arrived at the CAC, she contacted Father to inform him that a forensic interview was about to begin with Carter. Father arrived at the CAC and was belligerent and demanded information about Carter. CAC staff determined that Father was a danger to the environment, and Father was escorted out of the interview area.

During his forensic interview, Carter stated that he lived with his mother and father. He stated that his mother was nice because she did not take his toys away, but his father was very mean to his mother and argued with her. Carter reported that he had seen his father grab his mother by the hands and "have" her against the wall. Carter said he was four years old when this incident occurred, and that he called the police and his father was put in jail. When asked about the bruise under his eye, Carter said that his mother "whooped" him on the eye because he would not stop playing with his toys. Carter stated that his father "whoops" him with a knife. Mother interrupted the interview at this point and retrieved Carter. She attempted to leave the CAC with Carter, but a supervisor and the interviewer prevented her leaving.

The caseworker interviewed Father. Father stated that he did not notice the bruise under Carter's eye and denied all allegations of drug use or domestic violence. Father explained that his sex offender registration resulted from an incident in which he "was dealing with a 19 year old drug addict." Father denied having any

3

inappropriate videos or pictures on his phone and offered to let the caseworker to go through his phone.

The caseworker then spoke to Mother about statements Carter made during his forensic interview. Mother stated that she had noticed the bruise on Carter's eye that morning and that it could have occurred "while they were wrestling a few days ago." Mother denied that Carter had ever called the police due to domestic violence and stated that Carter did not even know how to use a telephone. She explained that the police had been called to their home because their neighbors were playing loud music and she and Father got into an argument about it. She maintained that there is no drug use in the home.

When Department caseworkers informed Mother and Father that Carter was being removed from the home, Father claimed it was a "conspiracy" and that he and Mother had court proceedings for an eviction proceeding the next day. According to the caseworker, Father then "wished death" to all Department staff present.

2. *Department and criminal history pre-dating the referral*

In October 2014, the Department received a referral that Father was seen slapping then three-year-old Carter in the face in public and treating Carter "like a punching bag." The Department ruled out the case and closed the investigation.

Mother has no criminal history. But Father has a lengthy criminal history, including the following convictions and sentences:

- 02/21/1990  Possession of Marijuana – 10 days' confinement
- 02/27/1992  Criminal Mischief and Trespass – 25 days' confinement
- 01/14/1993  Evading Arrest – 30 days' confinement
- 03/27/1995  Misdemeanor Theft – 45 days' confinement
- 03/27/1995  Felony Theft – 2 years' probation

4

- 05/29/1997  Criminal Trespass and Escape – 75 days' confinement
- 08/11/1997  Theft – 1 year's confinement
- 08/12/1998  Burglary of Habitation – 2 years' confinement
- 05/17/2001  Theft – 180 days' confinement
- 03/02/2002  Resisting Arrest – 190 days' confinement
- 05/04/2003  Sexual Assault – 5 years' confinement
- 03/10/2009 Possession of Marijuana and Evading Arrest – 20 days' confinement

3.   *Pretrial removal affidavit*

The Department filed a petition for protection of a child, for conservatorship, and for termination in suit affecting the parent-child relationship, supported by an affidavit outlining many of the above facts.  The Department requested Carter's removal because Mother and Father could not adequately supervise Carter due to their alleged drug abuse and history of domestic violence.  As noted above, Carter reported Mother's and Father's domestic violence during his forensic interview.  Based on the parents' history of violent behavior, Father's threatening behavior toward agency staff, and the allegations of drug abuse, the Department opined that there was an immediate and continuing danger to Carter's physical health and safety warranting Carter's removal and naming the Department his temporary managing conservator.

4.   *Family service plan*

Following Carter's removal, the trial court signed a temporary order appointing the Department as Carter's temporary managing conservator and ordering Mother to comply with a family service plan.  The order explained that Mother's failure to comply with the court's orders could result in restriction or termination of her parental rights.

The family service plan required Mother to:

- participate in and successfully complete family therapy;

- attend, actively participate in, and successfully complete domestic violence classes and provide the caseworker with a copy of the completion certificate;

- maintain stable and safe housing for a minimum of six months, permit her caseworker access to her residence to verify safety, and notify her caseworker of new leasing information if she relocates;

- provide caseworker with any and all sources of income, including public aid, by the 15th of each month;

- participate in and successfully complete a psychological evaluation and follow all recommendations;

- participate in and complete a drug/alcohol assessment and follow all recommendations;

- participate in random drug/alcohol testing on the request of her caseworker and show progress by testing negative for drugs or alcohol; and

- attend, actively participate in, and complete parenting classes.

## B. Trial Testimony

Trial commenced in March 2017, but the trial court recessed the case so the parties could attempt mediation. When mediation was unsuccessful, trial recommenced in September 2018. Before hearing testimony, the trial court admitted several exhibits without objection, including the removal affidavit, the parents' family service plans, the court-appointed advocate's report, Mother's and Father's drug test reports, and Father's criminal records. The Department called Bruce Jefferies from the National Screening Center, National Assessment Center as its first witness. The parties stipulated to Jefferies expertise in interpreting drug test results.

According to Jefferies, Mother tested "clean, except on the outside, she had a low reading of marijuana" on her first drug test in March 2016. Mother tested "clean" in April and August 2016. However, in January 2017, Mother tested positive for cocaine. She tested "clean" in February, but she again tested positive for cocaine in

6

July 2017, October 2017, January 2018, April 2018, and May 2018. Jefferies testified that Mother's test results are not indicative of an "everyday" use of cocaine.

Jefferies stated that Father's first drug test showed that he was a "chronic" marijuana user. Additionally, Father refused to comply with numerous drug test orders, and his family service plan provided that any such refusal "will be considered as testing positive." According to Jefferies, Father's May 2018 drug test showed that "[w]ithin the three days of taking this test, he ingested a lot of cocaine."

The Department's caseworker, Thelma Taylor, testified next. Carter, then seven years old, was currently placed in a residential treatment facility ("R.T.C. facility") due to his past behaviors of "aggressively threatening to harm his foster parents," and saying he wanted to kill them or have his father kill them. Additionally, Carter had made terroristic threats at school by threatening to "kill some of the kids in his class." Carter also acted out frequently at school; he engaged in fighting and failed to pay attention. Carter was in therapy and had been diagnosed with A.D.H.D., oppositional defiance disorder ("O.D.D."), and "child neglect." Within the month preceding trial, Carter was "doing better in school and at the R.T.C. facility. The behaviors are still there; however, they're not as aggressive as before." According to Carter's therapist, Carter learned his aggressive and disruptive behaviors from his father, with whom Carter visited regularly. After visits with Father, Carter sometimes tells his therapist or Taylor that he has been told to act out in placements.

Neither Mother nor Father had completed their respective family service plans. Because Mother made inaccurate reports on her psychological assessment, she failed to complete her psychological evaluation. Mother successfully completed her substance abuse assessment and counseling, but she subsequently tested positive for cocaine. The Department offered Mother additional substance abuse counseling after she tested positive for cocaine, and Mother enrolled in the counseling. However,

7

Mother continued to test positive for cocaine. According to Taylor, Mother had not provided housing or employment information, as required by the family service plan.

In Taylor's view, Carter's best interest would be served by terminating Mother's rights. The Department had been working with Mother (and Father) for over two years, giving her time to make lifestyle changes, but she continued to test positive for drugs. Additionally, Carter needs to be in a safe home, free of domestic violence and drug use. According to Taylor, Carter's therapist expects him to do better in therapy if Mother and Father are no longer able to see him. Taylor testified that, although Carter is currently in an RTC, family placements may be available if parental rights are terminated; family members have been reluctant to step forward and get involved with Carter due to Father's aggressiveness. Additionally, Mother exhibited unwillingness to leave Father, even when given a chance to provide a better home for Carter by moving in with fictive kin. Mother refused because she did not want to leave Father. The Department's original concerns with Mother centered on whether she could protect Carter, but concerns have arisen in other areas over the course of the Department's involvement with this family. Drug use has become a concern as well because Mother tested positive for cocaine repeatedly while in substance abuse therapy.

Taylor testified that Carter's visits with Mother and Father have "hurt" him. After some visits, Carter tells Taylor or his therapist that he's been told to "act out in placements." Although Carter has been in eight foster placements while under the Department's conservatorship, at least two people are "ready, willing and able to take [Carter] into their home" once parental rights are terminated, but these people are "so afraid of the parents, they're not ready to come forward" until then.

Child Advocates' Aleisha Stamps confirmed that Carter came into the Department's care due to allegations of neglectful supervision. Stamps agreed that

Child Advocates was "aligned" with terminating parental rights. She explained that it was in Carter's best interest to terminate Mother's and Father's rights:

> We have parents who have not completed viable services on their service plan. We have concerns with their ability to parent moving forward. We have parents who have consistently come to court and not given truthful information. We have a child with severe behavioral issues and if they're going to properly parent [Carter], they have to be able to make sure that all of his needs are gonna be met, including medical, psychological needs, things of that sort and the parents are not recognizing his issues at this time. As well as we have two parents who are consistently testing positive for illegal substances. That is a concern in their ability to parent and supervise their children – their child.
>
> And then the fact that [Carter]'s behavior seems to have gotten worse since being in care and some of that, I know for me, [Carter] has made statements, said the same statements to the current caseworker, his father has told him to act in certain ways in his foster home in order for him to get home. More specifically, making allegations of abuse towards his foster parents. So with all of those issues, we feel that termination would be in the best interest of the child.

Father, representing himself, questioned Mother about Carter's statements during his forensic interview concerning domestic abuse, i.e., Carter's statements that he had seen Father grab Mother by the hands and "have" her against the wall. Mother explained that what Carter described was she and Father holding hands, "maybe like boyfriend girlfriend, husband wife type holding hand thing. Like any little innocent couple would be." She denied any domestic abuse and testified that, if Father—or anyone else—struck her, she would strike back, or if necessary, call the police. Mother testified that she was currently unemployed. She also disclaimed ever drinking or smoking, stating that she took ibuprofen occasionally. She denied that she or Father ever directed Carter to act out in his foster placements, stating that they "always tell him to act good, try to do your best and listen to what they have to say."

9

Mother explained that, when she was given an opportunity to move to Beaumont with her fictive kin, she was unwilling to do so because it would jeopardize her housing in Houston. She denied that the individual, a doctor, offered her and Carter a place to stay to help remove Mother and Carter from Father's history of crime and drug abuse. Instead, she stated this person told her she knew someone who could get her an apartment and "possibly" a job.

Mother acknowledged that she signed a family service plan and that she fully understood it. She claimed she was almost completely done with the plan, having "maybe four or five more classes of individual left." She stated that she was initially unable to complete the domestic violence classes because they were too expensive. However, she testified that she had now completed those classes and provided her certificate of completion to a caseworker to provide to her own caseworker, Thelma Taylor. Mother acknowledged that part of her family service plan was to "not test positive for drugs." She could not explain her positive drug test results, but stated that she planned to see a doctor to make sure there was nothing physically wrong with her. Finally, Mother claimed she was unaware of Father's marijuana use until this case started; she also stated that she did not find out about Father's extensive criminal history until "a couple years after" she started seeing him.

Father's mother ("Grandmother") testified that she had never seen Father and Mother be physically violent toward each other. Also, she had never seen Carter with any bruising beyond "what little boys playing around" may get. She affirmed that Carter always had food, toys, and a proper home. Grandmother had never seen Carter misbehave other than "little temper tantrums." Grandmother had never seen Mother drink, smoke, or take any kind of drugs. When cross-examined about Father's extensive criminal history, Grandmother testified that she does not believe Father has a "problem with committing crimes." She had never seen Father abuse Carter and

10

described Father as a "caring father." Grandmother was currently unable to take Carter into her home because she lived with a disabled person.

Finally, Father testified and explained that, although he has a lengthy criminal history of which he is not proud, once Carter was born, he "vowed to take care of him and . . . did it to the best of [his] ability." Carter had never missed a dental or medical appointment and was not diagnosed with any disorders prior to being in the Department's care. Father confirmed that he had been an "everyday" user of marijuana when the Department first opened its investigation, but he cut back on his marijuana use after Carter was born and quit completely once the Department removed Carter from his care. Father asked for more time to complete his services.

At the conclusion of trial, the trial court granted the Department's request to terminate both parents' rights. The trial court terminated Mother's rights on grounds of endangerment and failure to comply with the family service plan. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), and (O). The court further found that termination of Mother's rights was in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(2). This appeal timely followed.

## II.   ANALYSIS

In three issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's predicate findings of endangerment and failure to comply with the family service plan and the finding that that termination is in the child's best interest.

## A.   Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support an order terminating parental rights. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.). We review the legal sufficiency of the evidence by considering all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 336 Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this standard does not compel us to disregard all evidence weighing against the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under section 161.001(b)(1) and that termination is in the child's best interest under section 161.001(b)(2). Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B.    Predicate Termination Grounds

Only one predicate finding under section 161.001 is necessary to support a judgment of termination when the trial court also finds that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We begin by addressing the trial court's finding under section 161.001(b)(1)(E).

Termination of parental rights is warranted if the fact finder finds by clear and convincing evidence, in addition to the best-interest finding, that the parent has, "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A finding of endangerment under subsection E requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or

13

failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

Although endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738-39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *In re A.L.H.*, 515 S.W.3d at 92. Among the types of actions or omissions constituting evidence meeting this standard are criminal activity that exposes a parent to incarceration,[3] drug abuse and knowledge that a child's parent abused drugs,[4] and domestic violence and propensity for violence.[5]

---

[3] *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent, may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.).

[4] *In re U.P.*, 105 S.W.3d 222, 234 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (finding evidence legally sufficient to support endangerment when father knew mother abused drugs while pregnant, but failed to report mother to the department or police).

[5] "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *accord S.R.*, 452 S.W.3d at 361. Violence does not have to be directed toward the child or result in a final conviction—"Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction." *In re V.V.*, 349 S.W.3d at 556; *see also In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Criminal offenses in addition to drug activity can constitute endangerment because they significantly harm the parenting relationship. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

Viewing the evidence under the appropriate standard of review, the record contains significant evidence of Mother's endangering conduct. When first interviewed by a Department caseworker, Carter stated that his parents spank them with their hands, sometimes leaving bruises. During his forensic interview at the CAC, Carter outcried that he had been abused: he stated that the bruise under his eye resulted when Mother "whooped" him on the eye and that Father "whoops" him with a knife. When Carter made these outcries, Mother immediately interrupted the interview, took Carter, and tried to leave the CAC. Direct physical abuse is clearly endangering conduct. *See In re G.P.*, No. 01-16-00346-CV, 2016 WL 6216192, at *11-12 (Tex. App.—Houston [1st Dist.] Oct. 25, 2016, no pet.) (mem. op.) (parent's slapping and yelling at child, as well as "whooping" another child with a belt, multiple times sufficient to support endangerment finding); *In re L.E.M.*, No. 02-11-00505-CV, 2012 WL 4936607, at *14 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (mem. op.) (children's statements of physical abuse by parents sufficient to support endangerment finding).

Additionally, despite a requirement to remain drug-free, Mother tested positive for cocaine on numerous occasions during the service plan's pendency and while fully knowledgeable of her obligations and that her parental rights were at risk. Between March 2017 and September 2018—the period during which trial recessed and recommenced—Mother tested positive for cocaine on four occasions: October 2017, January 2018, April 2018, and May 2018. Mother's ongoing drug use supports an endangerment finding under subsection E. *See, e.g.*, *In re D.J.W.*, 394 S.W.3d 210, 221 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (proof of a custodial parent's

pattern of illegal drug use constitutes endangering parental conduct because it exposes a parent to incarceration or impairment); *In re J.T.G.*, 121 S.W.3d 117 (Tex. App.—Fort Worth 2003, no pet.).

Mother was also unwilling to acknowledge her ongoing cocaine use, which suggests she will continue to abuse drugs and therefore continue to endanger her child. *See In re A.J.E.M.-B.*, Nos. 14-14-00424-CV, 14-14-00444-CV, 2014 WL 5795484, at *5 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.) (considering evidence that parents "minimized concerns and were in denial of the impact that substance use has on their ability to sufficiently be in tune to the needs of their child"); *In re E.H.*, No. 02-09-00134-CV, 2010 WL 520774, at *4-5 (Tex. App.—Fort Worth Feb. 11, 2010, no pet.) (mem. op.) (considering father's denial that his drug use and drug dealing harmed his children as factor in endangerment analysis). A parent's continuing drug-related conduct can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *See In re J.O.A.*, 283 S.W.3d at 345; *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A parent's drug use exposes the child to the possibility the parent may be impaired or imprisoned and, thus, unable to take care of the child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617-18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The fact finder may give "great weight" to the "significant factor" of drug-related conduct. *In re L.G.R.*, 498 S.W.3d at 204.

Further, Mother allowed Carter to remain within Father's direct and daily sphere of influence, which endangered Carter's physical or emotional well-being on multiple fronts. Mother knew, for example, that Father had a substantial criminal history, including registration as a sex offender. Evidence shows Father engaged in physically violent and aggressive behavior toward Mother (by grabbing and "hav[ing]" Mother

16

against the wall) and toward Carter (by "whoop[ing]" him with a knife);[6] Father engaged in ongoing drug use; Father acted aggressively toward CAC staff, prompting his escorted removal from the room, and he resisted completing the family service plan; Father encouraged Carter to display recalcitrant and threatening behavior toward foster adults—authority figures Carter should respect. Afforded the opportunity to remove herself and her son from cohabitation with Father and live in a different city miles away, Mother refused.

The evidence demonstrates a voluntary, deliberate, and conscious course of conduct by Mother that endangers Carter's physical or emotional well-being. *See In re S.R.*, 452 S.W.3d at 361. Considered in the light most favorable to the trial court's finding, a reasonable fact finder could have formed a firm belief or conviction that termination of Mother's parental rights was justified under Family Code section 161.001(b)(1)(E). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude the evidence is legally and factually sufficient to support the 161.001(b)(1)(E) finding.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection E, we need not review the sufficiency of the evidence to support the subsections D or O findings. *See A.V.*, 113 S.W.3d at 362. We overrule Mother's first and second issues.

---

[6] Abusive or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the physical or emotional well-being of a child. *D.O. v. Tex. Dep't of Human Svcs.*, 851 S.W.2d 351, 354 (Tex. App.—Austin 1993, no writ); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied).

## C.     Best Interest of the Child

We turn to Mother's legal and factual sufficiency challenges to the trial court's best-interest finding.

The trier of fact may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with her natural parents, and it's the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72.

1.  *Desires of the child*

At the time of trial, Carter was seven years old. When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by the foster family, and has spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Carter was removed from Mother's care when he was five years old. He was arguably too young to express his desires. The record contains no direct evidence of Carter's desires.

2.  *Present and future physical and emotional needs of the child*

Mother acknowledges that all of Carter's present physical and emotional needs are being met. Since his removal, Carter has been diagnosed with A.D.H.D. and O.D.D.; there is no evidence that Mother is equipped to handle these diagnoses. Carter is currently enrolled in therapy and making improvements. Mother displayed an unwillingness to leave an environment that negatively impacted Carter's physical and emotional needs when she refused to leave Father despite being offered an alternative home and a chance for employment. A fact finder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet the child's needs in the future. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Further, the parents' failure to remain drug free and complete their family service plans raises concerns about their ability to satisfy Carter's present and future needs. *See In re S.A.S.*, No. 01-18-00393-CV, 2018 WL 6613865, at *7 (Tex. App.—Houston [1st Dist.] 2018, no pet. h.) (mem. op.).

3.  *Present and future physical and emotional danger to the child*

Evidence of a parent's unstable lifestyle, including habitual drug and alcohol use, can support the conclusion that termination is in the child's best interest. *In re A.R.M.*, No. 14-13-01039-CV, 2014 WL 1390285, at *10 (Tex. App.—Houston [14th

19

Dist.] Apr. 8, 2014, no pet.) (mem. op.). Here, Mother began testing positive for cocaine months after Carter's removal and continued to test positive for this drug even while enrolled in substance-abuse counseling; thus, the record demonstrates that Mother continued to abuse drugs even with the knowledge that by doing so, she risked termination of her parental rights. Moreover, Father acknowledged that he was a habitual marijuana user, and he tested positive for high levels of cocaine only a few months before trial. Father has an extensive criminal history, is a registered sex offender, and displayed aggressive behavior that hindered the Department's ability to find an appropriate foster placement for Carter; as well, there were allegations of domestic violence involving Father and Mother. *See, e.g.*, *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *13 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.) (parent's aggressive and hostile behavior throughout case supported best-interest finding). As noted above, Mother displayed an unwillingness to take Carter and leave this environment when offered an opportunity to do so. Nothing in our record indicates that Mother will protect Carter from being endangered by his exposure to Father.[7] *Cf. In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *19 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) ("While the evidence demonstrated that [father] has made significant progress with respect to his own drug addiction, such evidence does not negate a determination that [father] will protect his daughters from being endangered by their exposure to [mother], who, at the time of trial, was still abusing drugs.").

Although a reasonable fact finder could fairly credit Mother's alleged progress in completing her family service plan and decide it justified the risk of preserving the parent relationship, we cannot say the trial court acted unreasonably in finding Carter's

---

[7] The record reflects that Father failed to complete court-ordered anger management and domestic abuse classes, failed to follow the recommendations from his substance abuse assessment, and failed to complete substance abuse classes.

best interest lay elsewhere. *See In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of the child's best interest for the considered judgment of the fact finder. *See id.* at 531 (Frost, J., concurring).

4.    *Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the child by the individuals or agency seeking custody*

These factors compare the Department's plans and proposed placement of the child with the plans and home of the parent seeking to avoid termination of the parent-child relationship. *See In re D.R.A.*, 374 S.W.3d at 535.

Mother continued to use drugs after Carter was removed from her care. Mother contends she needs more time to complete services and demonstrate a safe and stable home. However, Mother was not candid with the court with regard to drug usage and her reasons for positive drug tests. The evidence does not indicate a stable home or adequate parenting skills on Mother's part. Mother is married to Father and continues to reside with him, despite Father's lengthy criminal history, acknowledged history of substance abuse, and his aggressive behavior. *See In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *18 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, no pet. h.) (not in child's best interest to return to home environment that included narcotics use and domestic violence).

In contrast, the Department has identified at least two people who are "ready, willing, and able" to take Carter into their home, but only once parental rights are terminated. These individuals were reluctant to come forward while Father is still involved in Carter's life as Father is "very aggressive" and "not a good guy." And although the Department had no definitive plans for Carter's permanent placement and adoption, the lack of such plans is not dispositive to the best interest finding. *See In re C.H.*, 89 S.W.3d at 28.

21

5.    *Programs available to assist in promoting the child's best interest*

In determining the best interest of the child in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). The caseworker testified that Mother failed to complete her family service plan.[8] Mother's failure to complete the court-ordered service plan—particularly after having over two and one-half years to do so— demonstrates that she is unwilling to take advantage of the services offered to her by the Department and casts further doubt on her parenting abilities. *See In re I.L.G.*, 531 S.W.3d 346, 355-56 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); Tex. Fam. Code § 263.307(b)(10), (11); *see also In re S.B.*, 207 S.W.3d 877, 887-88 (Tex. App.— Fort Worth 2006, no pet.) ("[A] parent's drug use, inability to provide a stable home, and failure to comply with [the] family service plan support a finding that termination is in the best interest of the child.").

6.    *Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions*

Mother's continuing narcotics use while this case was pending supports the trial court's best-interest finding. Additionally, Mother expressed no plans to protect Carter from being endangered by his exposure to Father. *See In re K.C.F.*, 2014 WL 2538624, at *19; *see also In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (explaining that parent's history of drug use is relevant to trial court's best-interest finding); *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.) (concluding that a parent's continuous drug use, unstable lifestyle, and criminal record

---

[8] As discussed above, although Mother contends she completed some services of the plan, the evidence established that she did not fully complete the plan. Compliance with a family service plan does not necessarily preclude or undermine a best interest finding. *In re M.G.D.*, 108 S.W.3d at 514.

supported best-interest determination); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86-87 (Tex. App.—Dallas 1995, no writ) (allowing fact finder to give significant weight to parent's drug-related conduct in making a best-interest finding); *see also* Tex. Fam. Code § 263.307(b)(8) (providing that, in determining best interest, courts may consider history of substance abuse by child's family or others who have access to the child's home).

Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis and all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of Mother's parental rights was in the child's best interest. *See* Tex. Fam. Code § 161.001(b)(2). We overrule Mother's sole issue.

### III. CONCLUSION

Based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's parental rights was justified under Family Code section 161.001(b)(1)(E) and was in Carter's best interest. *See In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *In re M.G.D.*, 108 S.W.3d at 513-14.

We affirm the decree terminating Mother's parental rights and naming the Department managing conservator.


/s/    Kevin Jewell
Justice


Panel consists of Justices Christopher, Jewell, and Bourliot.

23